# UNITED STATES DISTRICT COURT

### for the
### Middle District of Florida

| | | |
|---|---|---|
| PRIME TIME SPORTS GRILL, INC. D/B/A PRIME TIME SPORTS BAR | ) ) ) | |
| *Plaintiff* | ) ) | |
| v. | ) ) | Civil Action No. 8:20-cv-00771-CEH-JSS |
| DTW1991 UNDERWRITING LIMITED, A CERTAIN INTERESTED UNDERWRITER AT LLOYD'S LONDON | ) ) ) ) | |
| *Defendant* | ) | |

---

### DISPOSITIVE MOTION

### DEFENDANT DTW1991 UNDERWRITING LIMITED, A CERTAIN INTERESTED UNDERWRITER AT LLOYD'S OF LONDON'S

### MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

---

Mark D. Tinker, Esq., B.C.S.
Florida Bar No.: 0585165
**COLE, SCOTT & KISSANE, P.A.**
4301 West Boy Scout Boulevard
Suite 400
Tampa, FL 33607
Tel.: (813) 509-2613
Fax: (813) 286-2900
Primary e-mail: mark.tinker@csklegal.com
Secondary: mason.bradford@csklegal.com
*Trial Counsel for Underwriters*

## MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Middle District of Florida Rule 3.01, Defendant DTW1991 Underwriting Limited requests that the Court dismiss Prime Time Sports Grill, Inc.'s Amended Complaint for failure to state a claim upon which relief can be granted.

## Concise Statement of the Precise Relief Requested

Prime Time seeks a judicial declaration that an alleged loss of business income is covered by a policy of commercial property insurance issued by Certain Underwriters at Lloyd's, London. The existence or nonexistence of insurance coverage presents a pure question of law, and as a matter of law, Prime Time has not alleged any facts that give rise to coverage.

Prime Time asserts that the Florida Governor's issuance of two "Safer at Home" orders in response to the COVID-19 pandemic caused it to suspend its restaurant/bar operations and resulted in a loss of income. [Doc.6 at PageID 108, ¶6].  But the policy at issue is a commercial property policy, and its insuring agreement states that a covered suspension of operations "must be caused by direct physical loss of or damage to property at premises which are described in the Declarations." [Doc.6-1 at PageID 149].  Prime Time has not alleged any "direct physical loss to property" at the insured premises, and in good faith cannot do so.  There is no coverage as a matter of law, so the Court should dismiss this claim.

## Statement of the Basis for the Request

Under the *Erie* doctrine, "the construction of insurance contracts is governed by substantive state law." *Sphinx Intern., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 412 F.3d 1224, 1227 (11th Cir. 2005) (quoting *Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 819 (11th Cir. 1985)).  Florida applies the traditional rule of *lex loci contractus* to insurance contracts, such that

"the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006) (citing *Sturiano v. Brooks*, 523 So.2d 1126, 1129 (Fla. 1988). *See also Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985) ("Florida adheres to the traditional rule that the legal effects of terms of the insurance policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued.").

The subject insurance policy was issued to Prime Time in Florida, and it covers the described premises located at 14404 North Dale Mabry Highway, Tampa, Florida. [Doc.6-1 at PageID 117]. Florida law thus controls that policy's interpretation.

"Under Florida law, the interpretation of an insurance contract is a matter of law to be decided by the court." *AIX Specialty Ins. Co. v. Ashland 2 Partners, LLC*, 383 F. Supp. 3d 1334, 1337 (M.D. Fla. 2019) (citing *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985)). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). *See also Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1539 (11th Cir. 1991) ("Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint on the basis of a dispositive issue of law.").

Prime Time has alleged the facts of its claimed loss and has appended to its Amended Complaint a copy of the insurance policy that describes the coverage. "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes," including the Court's consideration of a motion to dismiss. Fed. R. Civ. P. 10(c); *Solis-Ramirez v. U.S. Dept. of Justice*, 758 F.2d 1426, 1430 (11th Cir. 1985) ("Under Rule 10(c) Federal Rules of Civil Procedure, such attachments are considered part of the pleadings for all purposes, including a Rule

12(b)(6) motion.").  Moreover, to the extent that any of the Amended Complaint's allegations conflict with the exhibit, "the exhibit controls." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls."). *See also Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) ("when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern").

In this case, the Amended Complaint alleges the following: Prime Time obtained a policy of commercial property insurance from Certain Underwriters at Lloyd's, London for its bar and restaurant in Tampa, Florida. [Doc.6 at PageID107 ¶¶3–4].  On March 17, 2020, Governor Ron DeSantis "ordered all bars and restaurants in the state of Florida, including Prime Time, to close for 30 days[1] in response to the COVID-19 pandemic." [Doc.6 at PageID108, ¶6].  On April 1, 2020, the Governor "further ordered a state-wide 'stay at home' order[2] for the entire state of

---

[1] The allegation that Prime Time was ordered to "close for 30 days" is demonstrably false. The Governor's March 17, 2020 order only limited restaurant occupancy to 50% of the building capacity, required a minimum 6-foot distance between groups of patrons, and limited parties to no more than 10 individuals. Fla. Gov. Exec. Order 20-68 (Mar. 17, 2020).  In ruling upon a motion to dismiss, a district court may consider an extrinsic document if its authenticity is not challenged or if it is a matter of public record. *Myers v. Foremost Ins. Co.*, 82015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).  Prime Time's allegation is thus false as a matter of public record, but that pretense is not dispositive of the coverage issue.

[2] Under the April 1, 2020 order, Prime Time's claim that it was ordered to close remains false.  Contrary to that allegation, the April 1 order states that restaurants are not only "encouraged to provide delivery, carry-out or curbside service," they should do so "to the greatest extent practicable." Fla. Gov. Exec. Order 20-91 (Apr. 1, 2020).  At all material times Prime Time advertised itself as doing just that.  Prime Time represented that it was open for business with its full menu—including beer and cocktails—available for pick up or delivery seven days a week. http://primetimesportsgrill.com; https://www.facebook.com/prime.sportsgrill.  As of the date of this Motion, it is advertising that it has resumed on-site dining in accordance with social distancing requirements. http://primetimesportsgrill.com.  Prime Time was never ordered to close.

Cole, Scott & Kissane
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Florida" to last an additional 30 days. [Doc.6 at PageID108, ¶6]. Those orders had a "devastating effect on Prime Time's business" in the form of lost income, and Prime Time has filed a claim seeking coverage for its pecuniary losses under the policy issued by Underwriters. [Doc.6 at PageID108–09, ¶¶6–9].

That policy is a commercial property policy, and its insuring agreement only extends coverage to business income losses if they are caused by a "direct physical loss of or damage to" the insured business property, stating in relevant part:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations.

[Doc.6-1 at PageID 149]. The policy defines those quoted terms as follows:

2. "Operations" means:
   a. Your business activities occurring at the described premises; and
   b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

3. "Period of restoration" means the period of time that:
   a. Begins:
      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or
      (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage; caused by or resulting from any Covered Cause of Loss at the described premises; and
   b. Ends on the earlier of:
      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

5

      **(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

      **(1)** Regulates the construction, use or repair, or requires the tearing down, of any property; or

      **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants". The expiration date of this policy will not cut short the "period of restoration".

* * *

**6.** "Suspension" means:

      **a.** The slowdown or cessation of your business activities; or

      **b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

[Doc.6-1 at PageID 157].

Underwriters have informed Prime Time that its claim is not covered because it has not presented any evidence "that there has been physical damage to your property." [Doc.6-2 at PageID 201].  Prime Time's allegations relate to purely economic losses brought on by outside events, not a direct physical loss to its insured property.  That coverage determination is correct as a matter of law, so the Court should dismiss this lawsuit. *See e.g. Houston Specialty Ins. Co. v. Vaughn*, 2016 WL 7386957, at *3 (M.D. Fla. Aug. 4, 2016) ("dismissal is warranted under Rule 12(b)(6) if, assuming the truth of the complaint's factual allegations, a dispositive legal issue precludes relief"); *Mama Jo's, Inc. v. Sparta Ins. Co.*, 2018 WL 3412974, at *10 (S.D. Fla. June 11, 2018) ("Plaintiff cannot recover under the Business Income (And Extra Expense) Coverage because Plaintiff cannot show that there was any suspension of operations caused by 'physical damage.'").

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

<u>**Memorandum of Legal Authority**</u>

I.     **Prime Time has not alleged a "direct physical loss of or damage to property" at the insured premises, so it has failed to plead a claim within the policy's coverage.**

Florida law places the burden on the insured, as the entity presenting the claim for coverage, to prove that the claim falls within the policy's affirmative grant of coverage. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997). *See also Diamond State Ins. Co. v. Boys' Home Ass'n, Inc.*, 172 F. Supp. 3d 1326, 1334 (M.D. Fla. 2016) ("the insured bears the burden of proving that a claim is covered by the insurance policy").  It necessarily follows that, to state a valid cause of action, an insured plaintiff's pleading must allege ultimate facts that bring the claim within the policy's insuring agreement. *Id.*

"A complaint that does not contain sufficient factual matter, accepted as true, to state a claim plausible on its face is subject to dismissal." *Houston Specialty Ins. Co. v. Vaughn*, 2016 WL 7386957, at *3 (M.D. Fla. Aug. 4, 2016) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)).  "Further, dismissal is warranted under Rule 12(b)(6) if, assuming the truth of the complaint's factual allegations, a dispositive legal issue precludes relief." *Id. See also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").

The issue presented by this case is a purely legal one, and it is straightforward.  Assuming all of Prime Time's factual allegations are true—including its demonstrably false assertions that the Florida Governor ordered the restaurant to "close for 30 days"—Prime Time's Amended Complaint does not allege a claim that falls within the policy's Business Income insuring agreement.  That is because Prime Time purchased a policy of commercial property insurance, and its Business Income coverage only applies to a slowdown or cessation of operations if it is "caused

**7**

by *direct physical loss of or damage to property*" at the insured premises. [Doc.1-1 at PageID 44] (emphasis added).

The requirement of a direct physical loss is both standard and necessary in property policies.  It would be impossible—and would in fact render the risk uninsurable—for an insurer to extend coverage to businesses for every economic "slowdown" attributable to an outside cause. On a day-to-day basis, every bad weather event could trigger a loss, the change in the Florida tourist season would inevitably trigger a loss, and for a themed business such as Prime Time Sports Grill, an idiosyncrasy such as a particular sports team winning or losing a playoff game could trigger a loss.  Such coverage would be untenable and, more important, that is not the coverage Prime Time purchased.

The actual coverage is a property coverage, and the principle that a business income loss "must be caused by direct physical loss of or damage to property" at the insured premises is well-established. *See e.g. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Group N.V.*, 906 So. 2d 300, 302 (Fla. 3d DCA 2005) ("business interruption and extra expense losses are covered only if 'resulting from' damage or destruction of real or personal property caused by a covered peril").

Under the plain meaning of the word, Prime Time has not alleged any form of "physical" loss or damage to anything.  As explained in the most recent edition of *Couch on Insurance*: "The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude losses that are intangible or incorporeal, and, thereby to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A *Couch On Insurance* § 148.46 (3d Ed. 2019).

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

"In ordinary parlance and widely accepted definition, physical damage to property means a distinct, demonstrable, and physical alteration of its structure." *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002).  As recently stated by the Southern District of Florida, a "direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) (quoting *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 779 (Cal. App. 4th 2010)).

The Court must "give meaning and effect, if possible, to every word and phrase in the contract, . . . and a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions. *Westport Ins. Corp. v. Tuskegee Newspapers, Inc.*, 402 F.3d 1161, 1166 (11th Cir. 2005) (quoting *J. Appleman, Insurance Law and Practice* § 7383 (1981)).  To find coverage for Prime Time's alleged claim in this case would be to eliminate the entire substance of the "Commercial Property" insuring agreement.

The fact that the loss must involve direct physical damage to insured property is buttressed by the contract's provision of Business Income coverage for losses incurred during the "period of restoration." [Doc.6-1 at PageID 149] ("We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'."). By policy definition, the "period of restoration" begins with the "direct physical loss or damage," and ends on the earlier of: (1) "The date when the property at the described premises should be

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

*repaired, rebuilt or replaced* with reasonable speed and similar quality;" or (2) "The date when business is resumed at a new permanent location." [Doc.6-1 at PageID 157] (emphasis added).

To allow for losses that are not physical, and thus do not require physical repair, rebuilding, or replacement, would render that entire definition—and as a result, the entire coverage part—not only nonsensical, but infinitely indeterminate.  As the court recognized in *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005), the terms "'rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature."

It would be senseless to tie an "end" date for coverage to the completion of "repair" if the event triggering that coverage is inherently and utterly incapable of being repaired.  "Suffice it to say that insurance policies will not be construed to reach an absurd result." *Deni Associates of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998).

Likewise, if coverage were extended to a loss with no physical component, it would have no logical or contractual limit.  The bargained-for and defined limit established by the "period of restoration" would be effectively stricken from the contract, leaving the coverage part incomplete and open-ended.  Florida law proscribes any policy interpretation where a provision would be "struck from the contract by way of judicial fiat and the bargained-for contractual terms would be rendered surplusage." *U.S. Fid. & Guar. Co. v. Romay*, 744 So. 2d 467, 471 (Fla. 3d DCA 1999).

The simple truth is that Prime Time's policy only covers a suspension of business operations if that suspension is caused by a direct physical loss to property at the insured premises, and it indisputable that Prime Time's Amended Complaint does not allege any such thing.  It only claims the economic side-effect of reduced sales stemming from the Florida Governor issuing

**10**

Cole, Scott & Kissane
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

COVID-19 "Safer at Home" orders, but that is a non-physical, purely pecuniary loss, and it does not give rise to coverage.

Under Florida law—as in all jurisdictions—"insurance contracts are construed in accordance with the plain language of the policies." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 739 (Fla. 2002) (citing *Prudential Property & Casualty Ins. Co. v. Swindal*, 622 So.2d 467. 470 (Fla. 1993)). At all times, "it is the function of the court to give effect to and enforce the contract as it is written," and a policy's terms "should be given their plain and unambiguous meaning as understood by the 'man-on-the-street.'" *Harrington v. Citizens Prop. Ins. Corp.*, 54 So. 3d 999, 1001 (Fla. 4th DCA 2010) (internal quotation omitted).

The COVID-19 situation is certainly challenging—and it has indeed gripped the entire planet—but the law dictates that "a court may not ascribe to a policy term a "meaning deemed more socially responsible or desirable to the insured," nor may it "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* at 1001–02 (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla.1986)).[3]

---

[3] All can appreciate the severity of this pandemic and the effects it has had on businesses, including restaurants such as Prime Time. But the remedy cannot be found by businesses asking courts to re-write their property insurance contracts. In fact, doing so would be catastrophic. Compelling insurers to subsidize the economic impact of the COVID-19 pandemic, with coverage neither contemplated by the policies nor purchased by the insureds—even if feasible on a nationwide scale—would only lead to coverage becoming unaffordable and realistically unobtainable for new, recovering, or existing businesses moving forward.

The government passed the $2 trillion Coronavirus Aid, Relief and Economy Security Act, the Coronavirus Preparedness and Response Supplemental Appropriations Act (earmarking $8.3 billion for small businesses), the Employee Retention and the Sick and Family Leave credits for small businesses, and is issuing Economic Impact Payments to employees—with more assistance to come. Those programs may provide relief to Prime Time and similarly-situated businesses, but it is neither the equitable solution nor is it the legal solution to re-write Prime Time's property insurance contract and gratuitously create coverage where none exists. *Intervest Const. of Jax, Inc. v. Gen. Fid. Ins. Co.*, 133 So. 3d 494, 497 (Fla. 2014) ("Courts may not 'rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties.'") (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla.1986)).

Cole, Scott & Kissane
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

A plain language reading of the parties' contract leads to the inescapable conclusion that Prime Time's alleged loss is not covered and, again, Florida law places the burden on the insured to plead and prove a viable claim. *LaFarge Corp.*, 118 F.3d at 1516. *See also Exhibitor, Inc. v. Nationwide Mut. Fire Ins. Co.*, 494 So. 2d 288, 289 (Fla. 1st DCA 1986) ("In a suit to recover under an insurance policy, the insured must prove that the loss did occur and that it was within the coverage of the policy."). Since Prime Time's Amended Complaint does not allege any facts that would fall within the coverage described by the insuring agreement, its claim fails as a matter of law and the Court should dismiss. *Neitzke*, 490 U.S. at 326.

II.   **Prime Time cannot allege any viable alternative theories for coverage arising out of the Governor's orders or COVID-19, so the Court should dismiss with prejudice.**

Prime Time's Amended Complaint fails to state a claim for coverage, and it is equally evident that Prime Time cannot formulate any alternative basis for coverage out of the Governor's orders or COVID-19 in general. The Court should therefore dismiss this lawsuit with prejudice.

A.   **Neither COVID-19 nor the Florida Governor's orders rendered the Prime Time premises uninhabitable and unusable as a structure.**

Underwriters anticipate that Prime Time will incorrectly attempt to manufacture a claim of physical loss by looking to cases dealing with uninhabitable structures, such as *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002). Decisions in that vein hold that, if a substance permeates a building without actually damaging it, but the presence of that substance renders the entire structure uninhabitable, the structure may be considered to have sustained a physical loss. The rationale is that the building is damaged as a whole, because it has completely lost its physical utility as such.

The *Port Authority* claim related to airborne asbestos particles, and the court explained the threshold inquiry as follows: "When the presence of large quantities of asbestos in the air of a

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner." *Id.* at 236. "However, if asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss. The structure continues to function—it has not lost its utility." *Id.* "The fact that the owner may choose to seal the asbestos or replace it with some other substance as part of routine maintenance does not bring the expense within first-party coverage." *Id.*

Underwriters anticipate that Prime Time may assert that either COVID-19 or the Governor's orders have rendered its restaurant similarly unusable in this case. But even if it were to further amend its pleadings to raise that claim, it would fail as a matter of law because Prime Time cannot possibly demonstrate uninhabitability.

### i.     The Governor's orders do not create a direct physical loss to property.

First, the Governor's orders do not render Prime Time's building uninhabitable or unusable. Quite to the contrary, the most recent cited order of April 1, 2020 states that restaurants are "*encouraged*" to remain open and to "provide delivery, carry-out or curbside service . . . *to the greatest extent practicable*." Fla. Gov. Exec. Order 20-91 (Apr. 1, 2020) (emphasis added).[4]  Such a claim thus fails as a matter of public record.

But even if that were not the case, courts have only applied the above theory to situations where uninhabitability is caused by something within the physical structure of the insured

---

[4] As noted previously, Prime Time remained open and operational, with its website advising: "Prime Time Sports Grill is open for curb side takeout or delivery using UberEats 11:30 a.m. to 8:30 p.m., Friday and Saturday Hours - 11:30 a.m.-9:30 p.m. . . . . We offer great food and ice cold beer, TO GO! Your favorite cocktail is also available TO GO! Safely stay in your car, and we will bring your order out to you." http://primetimesportsgrill.com.  Its social media advertising listed daily specials and stated: "We are following CDC guidelines to protect Our Staff and Customers. Full menu for Pick Up To Go Orders. We have a smaller menu for delivery on Uber Eats." https://www.facebook.com/prime.sportsgrill.

Cole, Scott & Kissane
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

property. *See e.g. Port Auth. of New York*, 311 F.3d at 236 (discussing "large quantities of asbestos in the air of a building"); W*idder v. Louisiana Citizens Property Ins. Corp.*, 82 So. 3d 294, 296 (La. App. 2011) (excessive levels of lead dust that migrated through the house and contaminated contents); *Gregory Packaging, Inc. v. Travelers Property Cas. Co.*, 2014 WL 6675934 (D. N.J. November 25, 2014) (toxic ammonia release inside building).

If the cause is an external or extrinsic force that merely prevents access to the building, coverage does not apply. That follows the policy language, because impeded access to the property is not a direct physical loss *to* the insured property itself. *See e.g. Roundabout Theatre Co., Inc. v. Cont'l Cas. Co.*, 302 A.D. 2d 1, 3 (N.Y. App. Div. 2002) (no direct physical loss when the city closed an area following a large scaffolding collapse, making a Broadway theatre inaccessible to the public and forcing it to cancel 35 performances of "Cabaret," because the theatre itself was undamaged); *Harry's Cadillac-Pontiac-GMC Truck Co., Inc. v. Motors Ins. Corp.*, 126 N.C. App. 698, 702 (N.C. App. 1997) (no direct physical loss where an extreme weather event made the property inaccessible, but did not damage it).

The court's decision in *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323 (S.D. N.Y. 2014) is instructive on that point. That lawsuit arose out of the widespread power outages that occurred in and around New York City during "Superstorm" Hurricane Sandy. *Id.* at 324. As the storm approached, and in anticipation of flooding that would damage its power grids, utility provider Con Ed preemptively shut off certain service networks to preserve their integrity. *Id.* at 325. As a result, a lower Manhattan building that housed law firm Newman Myers had no power and was closed to tenants for several days. *Id.* Newman Myers' employees could not access their 26th floor office, so the firm filed a claim under its commercial

property insurance policy with Great Northern. *Id.* When Great Northern denied that claim due to a lack of any physical damage to the insured property, Newman Myers filed suit. *Id.*

The law firm conceded that its office did not sustain actual structural damage, but argued that the "the policy term 'direct physical loss or damage' is met by the preemptive closure of its building in preparation for a coming storm . . . because the property at issue was rendered unusable or unsatisfactory for its intended purpose." *Id.* at 329. Rejecting that claim, the court distinguished cases involving issues such as asbestos or ammonia infiltration in properties by recognizing they implicate "some compromise to the physical integrity of the workplace." *Id.* But in the case before it, Con Ed's actions were completely external and did not directly or physically compromise Newman Myers' office. *Id.* at 331. The court thus rejected the claim, stating: "The words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure." *Id.*

The Eighth Circuit reached a similar conclusion in *Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006). Source Food was a supplier of beef products that sourced meat from Ontario, Canada. *Id.* at 835. In May of 2003, the USDA closed the border to beef importation from Canada after a Canadian cow tested positive for "mad cow" disease. *Id.* As a result, a truck load of Source Food's product, which was not itself contaminated, was denied entry into the U.S. *Id.*

Source Food ultimately lost its best customer due to its inability to fill orders, and submitted a claim for business interruption coverage to its insurer, USF&G. *Id.* USF&G denied the claim

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

because its policy stated that a covered suspension of operations "must be caused by direct physical loss to Property." *Id.*

On those facts, the Eighth Circuit rejected Source Food's argument that "the impairment of function and value of a food product caused by government regulation is a direct physical loss to insured property." *Id.*  It reasoned: "Although Source Food's beef product in the truck could not be transported to the United States due to the closing of the border to Canadian beef products, the beef product on the truck was not—as Source Foods concedes—physically contaminated or damaged in any manner." *Id.* at 838.  Because the "embargo on beef products" did not in any way cause a "direct physical loss to [Source Food's] property," it did not fall within the coverage provisions. *Id.*

In this case, even if the Governor had somehow completely blocked all access to the Prime Time property—which he did not—that action would not constitute a direct and physical loss to the insured property itself.  In the words of *Newman Myers*, it would be something "exogenous to the premises" causing its closure, but it would not be—in the words of the policy—a "direct physical loss" to property on the insured premises. *See also Altru Health Sys. v. Am. Prot. Ins. Co.*, 238 F.3d 961, 963 (8th Cir. 2001) ("Because flood waters did not damage the insured building, [the Hospital's] loss occurred when health authorities closed the Hospital for three weeks. This was a business interruption or time element loss, not a property loss.").

ii.    **The COVID-19 virus (SARS-CoV-2) has not caused a direct physical loss to property.**

There similarly can be no viable claim of direct physical loss to Prime Time's insured property arising from the actual COVID-19 virus.  That issue would first present a preliminary problem: Prime Time has not pled the virus's physical presence inside its restaurant.  But even if it did present that allegation, that presence still would not create any direct physical damage to the

insured property, nor would it render the structure uninhabitable.  It would at most require extra caution, cleaning, or sanitization, and under established law those are economic concerns, not physical ones.

The Southern District's recent decision in *Mama Jo's, Inc. v. Sparta Ins. Co.*, 2018 WL 3412974 (S.D. Fla. June 11, 2018) aptly illustrates that point.  Mama Jo's operates a restaurant in Miami, and it obtained a policy of commercial property insurance from Sparta. *Id.* at *1.  Identical to the policy in this case, that policy contained a "Business Income Loss (and Extra Expense) Coverage Form" and it stated that Sparta "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period or restoration'. The 'suspension' must be caused by direct physical loss of or damage to property." *Id.* (*compare with* Doc.1-1 at PageID 44).

For over a year and a half, the city performed extensive roadwork on a street adjacent to the restaurant. *Id.*  Mama Jo's claimed that, during that time, it experienced over $292,500 in lost business income, and furthermore spent over $16,000 to continuously clean the construction debris that infiltrated the building. *Id.*  It thus filed a claim for coverage with Sparta, asserting that "the construction related debris and dust caused damage to the insured's building" and required remediation in the form of "cleaning of the floors, walls, tables, chairs and countertops." *Id.*

Sparta denied coverage by stating that there had been no direct physical loss of or damage to property, and Mama Jo's filed suit. *Id.* at *2.  Examining that claim, Chief Judge K. Michael Moore of the Southern District stated that a "direct physical loss contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." *Id.* at *9 (internal quotation omitted).

Cole, Scott & Kissane
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

The court then noted that Mama's Jo's claim concerned dust and debris that required extensive cleaning, but under established law, "cleaning is not considered direct physical loss." *Id.* citing *Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012)). Cleaning is not a tangible damage to property and is at most an economic loss. *Id.*

The court further explained: "The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." *Id.* (quoting 10A *Couch on Ins.* § 148:46 (3d. Ed. West 1998)). "The fact that the restaurant needed to be cleaned more frequently does not mean [Mama Jo's] suffered a direct physical loss or damage" to its property. *Id.*   The court thus concluded: "Plaintiff cannot recover under the Business Income (And Extra Expense) Coverage because Plaintiff cannot show that there was any suspension of operations caused by 'physical damage.'" *Id.* at *10.

The Sixth Circuit reached a similar conclusion in *Universal Image Productions, Inc. v. Fed. Ins. Co.*, 475 Fed. Appx. 569 (6th Cir. 2012).  Universal leased a commercial space in a three-story building and obtained commercial property insurance with Federal. *Id.* at 569–70.  Following a period of heavy rain, Universal detected a strong odor on the first floor that was later determined to be a microbial contamination emanating from the sub-grade duct system. *Id.* at 570.  That contamination consisted of Stachybotrys (black mold) and Penicillium Aspergillus capable of emitting spores, so it required the building to shut down its entire HVAC system to prevent further spread. *Id.*

Although the building was not technically uninhabitable, the contaminated areas and lack of air conditioning—which made internal temperatures exceed 100 degrees—caused a severe

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

disruption in business and eventually led to Universal vacating the building. *Id.* at 570–71. Universal sought coverage for its business income loss from Federal, but the trial court rejected that claim because "Universal had not suffered any 'direct physical loss' as required by the policy." *Id.* at 571.

The Sixth Circuit affirmed that reasoning on appeal, stating: "Universal did not experience any form of 'tangible damage' to its insured property." *Id.* at 572–73. While it did incur the costs of remediation, cleaning, and moving expenses, "[t]hese are not tangible, physical losses, but economic losses." *Id.* at 573.

As part of that ruling, the court expressly rejected Universal's total loss theory. *Id.* at 574. It explained that working in a hot and crowded building during microbial remediation certainly would have been "difficult," but there was no indication that the structure was completely "uninhabitable." *Id.* at 575. To the contrary, for a period it had been inhabited and continued to function—albeit in reduced capacity. *Id.* The panel thus concluded: "In sum, while Universal certainly suffered a large inconvenience as a result of the mold and bacterial contamination of the Evergreen building, the damages resulting therefrom are not covered by the insurance policy issued by Federal. Universal did not suffer any tangible damage to physical property, nor were the Evergreen premises rendered uninhabitable or substantially unusable." *Id.*

This situation would be the same. There is nothing about the COVID-19 virus that makes a structure uninhabitable. Indeed, countless facilities throughout the nation have confirmed presence of that virus—hospitals and other medical clinics being primary among them—yet they are still open to business and their employees continue working. The virus requires that appropriate precautions be taken, but it does not cause direct physical damage to the property itself, and it does not destroy the property's physical utility as a structure and render it uninhabitable.

For those reasons, Prime Time cannot plausibly claim that either the virus or the Governor's orders satisfy the insuring agreement.

**B.      The policy's Civil Authority coverage similarly requires damage to property and an action of the civil authority that prohibits access.**

If Prime Time were to contend that coverage exists under the policy's additional coverage described by the Civil Authority provision, that claim would also fail as a matter of law.  The policy describes that coverage as follows:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> **(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> **(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

[Doc.6-1 at PageID 150].

As is evident in that text, Civil Authority coverage requires damage to property away from the insured premises, a civil authority prohibiting access to an area surrounding that damage as a result of it, and the insured property being within that area of civil authority prohibition.  For the same reasons as set forth above, Prime Time cannot claim that any of those things have occurred. There has been no damage to other property, and no civil authority has prohibited access to its premises.  The coverage therefore does not apply. *E.g. Dickie Brennan & Co., Inc. v. Lexington Insurance Co.*, 636 F.3d 683, 686–87 (5th Cir. 2011) ("Civil authority coverage is intended to

**Cole, Scott & Kissane**
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property."). *See also United Air Lines, Inc. v. Insurance Co. of Pa.*, 439 F.3d 128, 130 (2d Cir. 2006) (airline not entitled to coverage when a civil authority halted flights due to the September 11 terrorist attacks because the closure was for preemptive prevention of terrorism, not the "result of" a dangerous condition of the physical damage to the nearby Pentagon, or the authority's need to access it).

### <u>Conclusion</u>

It is Prime Time's burden to plead facts which would give rise to a claim of coverage.  It has not done so in this case, and it cannot do so because the policy's Business Income coverage requires that the suspension of operations be caused by a "direct physical loss of or damage to property" at the insured premises.  Absent any such claim, there is no coverage as a matter of law and the Court should dismiss this lawsuit.

Respectfully submitted,

Mark D. Tinker, Esq., B.C.S.
Florida Bar No.: 0585165
COLE, SCOTT & KISSANE, P.A.
4301 West Boy Scout Boulevard
Suite 400
Tampa, FL 33607
Tel.: (813) 509-2613
Fax: (813) 286-2900
Primary e-mail: mark.tinker@csklegal.com
Secondary: mason.bradford@csklegal.com
*Trial Counsel for Underwriters*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically serve a copy on the following users registered with that system: **Hannah E. Austin, Esq.**, and **Michael V. Laurato, Esq.**, *Counsel for Prime Time Sports Bar*, Austin & Laurato, P.A., 1902 West Cass Street, Tampa, FL 33606, (813) 258-0624/(813) 258-4625(F), efile@austinlaurato.com, haustin@austinlaurato.com, and mlaurato@austinlaurato.com, on this May 4, 2020.

Mark D. Tinker, Esq., B.C.S.
Florida Bar No.: 0585165
*Trial Counsel for Underwriters*

Cole, Scott & Kissane
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West