UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.: 8:20-cv-00771-CEH-JSS

PRIME TIME SPORTS GRILL, INC.,
d/b/a PRIME TIME SPORTS BAR,

       Plaintiff,

vs.

DTW 1991 UNDERWRITING LIMITED,
A CERTAIN INTERESTED UNDERWRITER AT
LLOYD⊘S LONDON,

       Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS [DE-13]

Pursuant to Local Rule 3.01(b), Plaintiff, PRIME TIME SPORTS GRILL, INC. d/b/a

PRIME TIME SPORTS BAR ("Prime Time"), hereby responds in opposition to Defendant's,

DTW 1991 UNDERWRITING LIMITED, A CERTAIN INTEREST UNDERWRITER AT

LLOYD⊘S LONDON ("Insurer"), motion to dismiss pursuant to Rule 12(b)(6) [DE-13].

### Introduction

This litigation presents a case of interpretation of a commercial insurance policy.  While

the parties appear to be in general agreement on the facts of the material COVID-19 events and

the policy of insurance, they disagree on the manner in which these policy coverages and terms

apply in the context of those COVID-19 events.

The first primary issue is whether the policy of insurance issued by the Insurer to Prime

Time provides coverage for the "risk" of COVID-19 governmental orders suspending normal

business operations.  If that risk is covered, the second major issue in this litigation is whether

the resulting "loss" of "business income" is, first, "actual" and, next, causally connected to that covered risk and sufficiently material and substantive—as distinguished from imaginary or fictitious—such that the "loss" to business income qualifies as either a "direct physical loss of" or "damage to" insured property.   A third, but related, principal issue is whether "business income" qualifies as "property" insured under the policy.  This list of issues is by no means exhaustive, but provides an overview of the foremost issues of contention from the point of view of Prime Time, the party that is seeking a declaration under the policy.

As discussed below, the Insurer's motion to dismiss is due to be denied and Prime Time is entitled to a declaration that the policy provides coverage, because the policy of insurance demonstrates that (1) the Insurer specifically undertook to indemnify Prime Time for "loss of" or "damage to" "business income and operating expenses, including payroll"—both of which are specifically scheduled as insured "property" under the policy, (2) sustained by Prime Time in direct consequence of the happening of any accident, misfortune, or other fortuitous event, including the governmental suspension orders at issue in this case—unless specifically excluded,, and (3) Prime Time's "loss" of business income is real, not fictitious, and its operating expenses are incurred, as opposed to imaginary.  In other words, a risk not excluded by the policy--COVID-19 and governmental orders relating to COVID-19--directly caused Prime Time a "loss" or "diminution" of specifically defined and scheduled insured property (i.e., business income, as one concrete example).

Accordingly, not only has Prime Time, at a minimum, sufficiently alleged a cause of action for declaratory judgment, but Prime Time has also sufficiently alleged that a "covered cause of loss" caused "direct physical loss of or damage to" insured "property."

The Insurer's motion is properly denied for the additional reason that the contract interpretation required to conclude this action is not appropriately decided at the motion to dismiss stage, but better suited for adjudication at the summary judgment stage or after trial.

## FACTUAL BACKGROUND[1]

Because this is an action to construe a policy of insurance, Prime Time will review first the relevant policy[2] and then the underlying facts that gave rise to Prime Time's denied insurance claim against the Insurer.

*The All-Risk Policy.* Since 1995, Prime Time has owned and operated a bar and restaurant in Tampa, Florida. [DE-6, ¶5]. The Insurer issued Prime Time an "all risk" policy of commercial property insurance with effective dates of June 7, 2019 through June 7, 2020. [DE-6, ¶3]. Prime Time attached a copy of the policy to the Amended Complaint. [DE-6-1]. The policy's declarations' page established that the overall, principle, and primary coverage grant of the policy was "all risk" when it noted "Coverage As Per Special Form CP 10 30 10 12." [DE-6-1 p. 117]. The Policy "Form" indicated on the declarations' page is "Special." [DE-6-1, p. 121]. The policy's Cause of Loss– Special Form ("Special Form") expressly provided as follows:

### A.   Covered Causes of Loss

When Special is shown in the Declarations, Covered Causes of Loss means *direct physical loss unless the loss is excluded or limited in this policy.*   [DE-6-1, p. 122](Emphasis added).

The Special Form neither defines the words "direct physical loss," nor employs any language to modify or limit that phrase, requiring that the direct physical loss be "of" covered

---

[1] The statement of facts is derived from Prime Time's Amended Complaint [DE-6], the allegations of which the Court must accept as true in ruling on the instant motion. *See, Linder v. Portocarrero, 963 F.2d 332, 334 (11th Cir. 1992); Quality Foods de Centro Am., S.A., v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994 (11th Cir. 1983).*

[2] The complete policy of insurance has been attached to the Amended Complaint. The provisions cited in this response are not comprehensive and there are other provisions in the policy that the Prime Time alleges coverage arises from. The provisions cited in this response are illustrative, because they establish that Prime Time has alleged a bona fide need from a declaration in this case.

property or "damage to" covered property.  In other words, there is no language in the Special Form's primary coverage grant which would support the proposition that the scope of the Special Form's coverage is limited only to misfortunes (i.e. "causes") that result in either a "loss of" or "damage to" insured property (i.e. "causation").

While the Special Form does not define the term "direct physical loss," the Special Form does thereafter go on to list specified exclusions, including "special exclusions" applicable only to specified coverage, including "Business Income (And Extra Expense) Coverage." [DE-6-1, p. 126].  The Special Form does not contain a specific exclusion for any loss caused by a governmental suspension or a virus.  [DE-6-1, pp. 122-127]  And, although the "special exclusions" in the Special Form applicable to business income does exclude any "loss resulting from damage to "finished stock," "damage to radio or television antennas," and "any increase of loss caused by¡  [s]uspension, lapse, or cancellation of any license, lease or contract," [DE-6-1, p. 126], again,  the Special Form contains no "special exclusion" for business income when the loss is caused by a governmental suspension or a virus.  [DE-6-1, pp. 122-127].

In addition to the primary coverage grant in the Special Form, the policy is endorsed with two additional coverage forms, which *expand* (through coverage extensions, inflation guards, replacement cost, optional coverage, and other additional coverage), but do not alter or limit, the primary "all risk" coverage grant of the Special Form.  These two additional forms are:  1) Building and Personal Property Coverage Form ("Building and Property Form"); and 2) Business Income (and Extra Expense) Coverage Form ("Business Income Form").  [DE-6-1, p. 133 & p. 149].

*The Building and Personal Property Endorsement.*  The Building and Property Form provides coverage as follows:

4

A.       **Coverage**

We will pay for direct physical loss of or damage to *Covered Property* at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.     [DE-6-1, p. 133](Emphasis added).

The Building and Property Form thereafter defines öCovered Propertyö as follows:

1.       **Covered Property**

Covered Property, as used in this Coverage Part, means the *type* of property described in this section, **A.1**, and limited in **A.2** Property Not Covered, *if a Limit of Insurance is shown in the Declarations for that type of property.*  [DE-6-1, p. 133](Emphasis added).

The declarations page of the policy of insurance contains a öCommercial Property Insurance Scheduleö (öSchedule of Property Insuredö) [DE-6-1, p. 121].   The Schedule of Property Insured in the declarations page specifically lists öBI (business income)ö as öCommercial Propertyö of Prime Time insured under the policy and shows a limit of insurance of ö200,000.ö  [DE-6-1, p. 121].

For covered causes of loss and exclusions, the Business and Property Form reverts back to the Special Form as follows:

3.       **Covered Causes of Loss**

See applicable Causes of Loss form as shown in the Declarations.  [DE-6-1, p 135].

B.       **Exclusions and Limitations**

See applicable Causes of Loss form as shown in the Declarations. [DE-6-1, p. 141].

*The Business Income and Extra Expense Endorsement.*  Like the Building and Property form, the Business Income Form provides coverage in addition to the Special Form through additional coverages for losses to business income, extra expense, interruption of computer operations, civil authority, extended business income, rental value, alterations and new buildings

5

and other coverage extensions.  And, like with the Building and Property form, the Business Income Form reverts back to the Special Form for covered causes of loss and exclusions as follows:

**3.      Covered Causes of Loss, Exclusions, And Limitations**

See applicable Causes of Loss form as shown in the Declarations. [DE-6-1, p. 150].

In the event of a covered cause of loss under the Special Form, the Business Income Form provides for the recovery of loss, *inter alia,* to:  1) Business Income; 2) Extra Expense; and 3) Business Income Other Than "Rental Value." [DE-6-1, pp. 149-151].

The Business Income Form defines "Business Income" as "[n]et income ([n]et profit before income taxes) that would have been earned or incurred [and] [c]ontinuing normal operating expenses incurred, including payroll." [DE-6-1, p. 149].

Like the Special Form, the Business Income Form fails to define the term "direct physical loss of" property.  And, although the Business Income Form adds the phrase "or damage to" (and, thus, distinguishing "damage" as something different than "loss"), the Business Income Form also fails to define the word "damage."  Importantly, the Schedule of Property Insured in the declarations page specifically lists "BI (business income)" as covered property and shows a limit of insurance of "200,000." [DE-6-1, p. 121).  In addition, the Schedule of Property Insured in the declarations page provides that "Option (1)" is selected [DE-6-1, p. 121], indicating that, under Prime Time's policy, the definition of Business Income will include rental value.

The Business Income form states that "[o]ther words and phrases that appear in quotation marks have special meaning[;] [r]efer to Section **F.** Definitions[.]" [DE-6-1, p. 157].  Section F. Definitions of the Business Income form provides the following definitions of words and phrases that appear in quotation marks in the Business Income Form:

### F.   Definitions

**2.**   "Operations" means:

**a.**   Your business activities occurring at the described premises; and

**6.**   "Suspension" means:

**a.**   The slowdown or cessation of your business activities[.] .[DE-6-1, p. 157]

As it relates to extra expense coverage, the Business Income form provides the following additional coverage:

**2.**   **Extra Expense**

We will pay Extra Expense (other than expense to repair or replace property) to:

**(1)**   Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(2)**   Minimize the "suspension" of business if you cannot continue "operations." [DE-6-1, pp. 149-150].

The Business Income form also provided for additional coverage under the title "Civil Authority," in pertinent part as follows:

**5.**   **Additional Coverages**

**a.**   **Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)**   Access to the area immediately surrounding the damage property is prohibited by civil authority as a result of damage, and the

described premises are within that area but are not more than one
mile from the damaged property; and,

**(2)**    The action of civil authority is taken in response to dangerous
physical conditions resulting from the damage or continuation of
the Covered Cause of Loss that caused the damage, or action is
taken to enable the civil authority to have unimpeded access to the
damaged property.  [DE-6-1, p. 150].

*Insurance Claim.*  Beginning on March 17, 2020, Ron DeSantis, the Governor of the

State of Florida, issued a series of executive orders relating to the COVID-19 pandemic, which

had the effect of suspending the normal operations of bars, nightclubs and restaurants state-wide.

[DE-6, ¶6].   For Prime Time, the governmental suspension orders had a devastating effect on

Prime Time's business income that will continue into the future. [DE-6, ¶6].

Following the first in the series of orders from Governor DeSantis, Prime Time, on

March 17, 2020, notified and made a claim with the Insurer under its policy due to slow down

and cessation of its business operations, claiming a loss of business income.  [DE-6, ¶ 7].  On

March 23, 2020, the Insurer denied Prime Time's claim, stating that, under the Special Form,

"[t]here is no evidence that your business operations have been suspended because of a direct

physical loss."  [DE-6-2].  In addition, the Insurer denied Prime Time's claim under the "Civil

Authority" additional coverage of the Business Income Form, stating that ""[t]here is no

evidence that there has been physical damage to your property or to an adjacent property

according to the Civil Authority directed by your government."  [DE-6-2].

## Procedural Background

Prime Time commenced this action by filing a one count complaint for declaratory relief

seeking a declaration that the policy issued by the Insurer provides coverage for the losses to

Prime Time's business income stemming from the COVID-19 governmental suspension of

business operations, other incurred extra expense and all other Business Income coverage

extensions up to the limits of policy ($200,000). [DE-1, p. 5].   Prime Time also requested supplementary relief based on the declaratory judgment and the entry of final declaratory judgment for all declaratory and supplemental relief, including costs, prejudgment interest, and reasonable attorney's fees.  [DE-1, p. 5].  On April 8, 2020, Prime Time filed an Amended Complaint seeking the same declaratory and supplemental relief.  [DE-6].

In response to the Amended Complaint, the Insurer now moves for dismissal of the declaratory judgment complaint pursuant Rule 12(b)(6), Federal Rules of Civil Procedure.  In the motion, the Insurer argues that Prime Time's Amended Complaint fails to state a claim upon which relief can be granted, because Prime Time has not alleged any "direct physical loss to property at the insured premises, and in good faith cannot do so" and "there is no coverage as a matter of law."  [DE-13, p. 2].

## Standard for Motion to Dismiss

On a motion to dismiss, the Court accepts as true all of the factual allegations in the complaint and construes them in the light most favorable to the plaintiff.  *Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004)*.  To survive a motion to dismiss, a pleading must include a "...short and plain statement showing that the pleader is entitled to relief."  *Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Fed. R. Civ. P. 8(a)(2))*.

## Prime Time Sufficiently Alleges a Plausible Basis for  Declaratory Relief

The overarching, substantive basis upon which the Insurer bases its motion to dismiss asserts that Prime Time fails "to state a cause of action upon which relief can be granted."  [DE-13, p.2].  Although the Insurer's motion does not appear to challenge that Prime Time has alleged a plausible basis for declaratory relief, the motion does state that Prime Time failed to

state a cause of action in the Amended Complaint and the Amended Complaint only states a cause of action for declaratory relief. [DE-6]. And so, Prime Time will address the contention that Prime Time failed to sufficiently state a cause of action for declaratory relief in this response.

Invoking diversity jurisdiction under 28 U.S.C. §1332, the Amended Complaint seeks a declaratory judgment to construe a policy of insurance under both Florida's Declaratory Judgment Act and the Federal Declaratory Judgment Act. [DE-6, ¶1, 2]. The allegations of the Amended Complaint and attachments thereto demonstrate a genuine good faith doubt and uncertainty as to the rights and obligations under the policy of insurance that are immediate, actual, and likely to continue in the future. [DE-6].

Because this Court is hearing this case based upon diversity jurisdiction and Prime Time has also invoked the Federal Declaratory Judgment Act in the Amended Complaint, it is treated procedurally as if it were originally filed in federal court. *Fernandez v. Scottsdale Ins. Co., 2007 WL 2209280, at *1 (M.D.Fla. 2007); Casault v. U.S. Bank, N.A., Case No: 6:14-cv-135-Orl-18DAB, 2014 WL 12614424, at *2-3, 2014 U.S. Dist. LEXIS 181526, *7-8 (M.D. Fla. Aug. 27, 2014).*

The Declaratory Judgment Act states that a declaratory judgment may be sought in an effort to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *See 28 U.S.C. § 2201.* In fact, "[t]he Declaratory Judgment Act allow[s] relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked." *Skelly Oil Co. v. Phillips Oil Co., 339 U.S. 667, 672, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).* Further, the Declaratory Judgment Act specifically provides that a declaratory judgment may be issued only in the case of an actual

controversy. Based on the facts alleged, there must be a substantial continuing controversy between two adverse parties.ö *Malowney v. Federal Collection Deposit Group, 193 F.3d 1342, 1347 (11th Cir.1999).* That controversy õmay not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury.ö *Id.* (internal quotations omitted). In order to have a successful claim for a declaratory judgment, the proponent õmust assert a reasonable expectation that the injury they have suffered will continue or will be repeated in the future.ö *Id.* This language does not, of itself, confer jurisdiction upon federal courts. *Murphee v. Tides Condominium at Sweetwater by Del Webb Master Homeowner's Ass'n, Inc., 2014 WL 1293863 (M.D.Fla. 2014).* Rather, a suit brought under the Declaratory Judgment Act must state some independent source of jurisdiction. *Id.* A dispute involving insurance coverage is precisely the type of claim that lends itself to declaratory relief. *Nirvana Condominium Ass'n, Iinc. v. QBE, Ins. Corp., 589 F.Supp.2d 1336, 1343 (S.D.Fla. 2008).*

Section 2202 states expressly that õ[f]urther necessary or proper relief on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.ö District courts typically rely on § 2202 as a vehicle for modifying or granting relief in addition to the initial relief awarded by the court pursuant to 28 U.S.C. § 2201(a). Section 2202 thus accords a district court some measure of flexibility to enter subsequent orders to effectuate the intent of an earlier § 2201(a) judgment. *See, e.g., Burford Eqpt. Co., Inc. v. Centennial Ins. Co., 857 F.Supp. 1499, 1502 (M.D.Ala.1994).*

This Court has repeatedly held that a declaratory judgment action arising under the Florida Declaratory Judgment Act, and treated procedurally under the Federal Declaratory

Judgment Act, seeking declaratory relief with regard to rights under an insurance contract adequately alleges a claim upon which relief can be granted.  *Garnett v. First Liberty Ins. Corp., 2014 WL 12616989 (M.D.Fla. 2014)(J. Honeywell).*   A review of the Amended Complaint indicates that there is a real coverage dispute in this case, and, as such, Prime Time has sufficiently alleged a claim for declaratory relief.

## Prime Time Sufficiently Alleges a Covered Cause of Loss

The Insurer's principal contention is that Prime Time has inadequately alleged a "direct physical loss of or damage to property." [DE-13, p.7].  As a result, the Insurer asserts that Prime Time "has failed to plead a claim within the policy's coverage." [DE-13, p.7].  What the Insurer is really saying— albeit inartfully--is that the risk alleged in the amended complaint to have caused the loss is not a covered cause of loss. ("The Governor's orders do not create a direct physical loss to property.") [DE-13, p. 13].  This argument is without merit, because the Insurer has (1) overlooked the nature of the underlying "all risk" policy, (2) conflated "covered cause of loss" with "loss to covered property," and (3), finally, sought to use an endorsement to change the overall nature of the "all risk" policy.  This the Insurer cannot do.

To determine whether a claim is within a policy's coverage, the Court must look to the type of coverage provided by the policy.  Under Florida law, this policy is an "all-risk" policy that provides coverage for all risks of loss, unless specifically excluded.  In Florida, when a policy insures for direct physical loss unless specifically excluded, the policy is held, as a matter of law, to create "all-risk" coverage.  *Fayad v. Clarendon Nat. Ins. Co., 899 So.2d 1082, 1084-1087 (Fla. 2005)(the specific type of policy that states "we insure for direct physical loss," as in Castillo and Phoenix, is an all-risk policy).*  Such a policy is to be considered as creating a special type of coverage extending to risks not usually covered under other insurance, and

12

recovery under the "all risks" policy will as a rule be allowed for all fortuitous losses not resulting from misconduct or fraud. *Phoenix Ins. Co. v. Branch, 234 So.2d 396, 398 (Fla. 4th DCA 1970).* Thus, a policy which insures against "all risks" ordinarily covers every loss that may happen except by the fraudulent acts of the insured— the very nature of the term "all risks must be given a broad and comprehensive meaning as to the covering of any loss other than the willful and fraudulent act of the insured." *Id.* Plaintiff's burden of proof under such policy is a light one: to make a prima facie case for recovery, a plaintiff must only such that such a loss occurred. *LaMadrid v. National Union Fire Ins. Co. of Pittsburgh, PA, 567 Fed. Appx. 695, 701 (11th Cir. 2014).*

As the Eleventh Circuit has noted, all-risk insurance policies cover all "fortuitous" losses, "unless the policy contains a specific provision expressly excluding the loss from coverage." *Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc., 639 Fed.Appx. 599, 601 (11th Cir. 2016).* A fortuitous event is an event which so far as the parties to the contract are aware, is dependent on chance. *Id.* In order to recover under an all-risk insurance policy, the insured must first show (1) a fortuitous loss (2) that occurred during the policy period. *Id. (citing, Banco Nacional De Nicaragua v. Argonaut Ins. Co., 681 F.2d 1337, 1340 (11th Cir. 1982); see also, Morrison Grain Co., Inc. v. Utica Mut. Ins. Co., 632 F.2d 424, 430-431 (5th Cir. 1980).*[3]

Without citing to the primary "all-risk" coverage grant of the Special Form, eliding any mention that each of the coverage grants contained in any endorsement to the policy reference the Special Form's "all-risk" coverage, and not citing any specific exclusion, the Insurer selectively pulls language from the definition of the Business Income Form, which is an endorsement to the policy, for its argument that the scope of Prime Time's claim is not "within"

---

[3]   In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc),* the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

the overall policy's all-risk coverage grant. This is both unavailing and has been specifically rejected in Florida.  It also violates the settled-principle of insurance policy construction, which requires the Court to read the policy as whole and give each provision its operative effect.

In *Mejia v. Citizens Property Insurance Corp., 161 So.3d 576 (Fla 2d DCA 2014)* and, again, in *Citizens Property Insurance Corp. v. Munoz, 158 So.3d 671 (Fla. 2d DCA 2014)*, the Second District Court of Appeal addressed a situation where the underlying policy, like the Special Form here, provided for all-risk coverage, but was endorsed, like this policy, with a coverage form which the insurer argued changed the all-risk nature of the policy– like the Insurer is impliedly attempting to do, here.  The Court in *Mejia* held that "it makes no difference that the sinkhole coverage was provided in an endorsement to the underlying policy" since "the endorsement does not change the "all-risks" nature of the underlying policy." *Mejia, 161 So.3d at 578.*

After all, the Business Income Form was designed to indemnify Prime Time for actual loss to "business income" caused by a covered cause of loss as defined by the Special Form.  The Building and Property Form was designed to indemnify Prime Time for loss to building and personal property of the "type" scheduled in the declarations page– and Business Income is specifically scheduled– caused by a covered cause as defined by the Special Form.  While the two policy endorsements can be properly said to provide *additional* coverage or limit the amount owed, there is no indication that either endorsement was intended to change the general all-risks nature of the Special Form--that any risk, even a governmental suspension order, unless specifically excluded, which causes loss of or damage to property is covered.

The Amended Complaint alleges that the "cause" of loss was the COVID-19 governmental suspension orders.  The Amended Complaint further alleges, and the policy

confirms, that there is no specific exclusion in the policy for losses caused by governmental suspension orders or viruses.   The Insurer, in its motion, has not asserted any applicable exclusion.   Accordingly, Prime Time has adequately further alleged a covered "cause" of loss" although it does not have to under this type of policy--which is within the all-risk coverage of the principle coverage grant of the policy. *See, Hartford Accident and Idem. Co. v. Beaver, 466 F.3d 1289, 1296 (11th Cir. 2006)("When an insurer relies on an exclusion to deny coverage, insurer has the burden of demonstrating that the allegations of the complaint are cast solely with the policy exclusion and are subject to no other reasonable interpretation; Munoz, 158 So.3d at 674 (under all-risk policy, insured does not need to disprove any excluded cause).*   The insurer's claim that Prime Time has failed to "allege ultimate facts that bring the claim within the policy's insuring agreement" is incorrect.   [DE-13, p.7].

To the extent that the Insurer advances other alternative interpretations of the "direct physical loss" language of the all-risk coverage grant of the Special Form, the Insurer does nothing except demonstrate the implausibility of its position on declaratory judgment, because the applicable legal standard requires that, in the case of alternative interpretations which narrow or restrict coverage, the policy should be construed against it and in favor of Prime Time. *Westmoreland v. Lumbermans Mut. Cas., 704 So.2d 176, 179 (Fla. 4th DCA 1997) (insuring or coverage clauses are construed in the broadest possible manner to effect the greatest extent of coverage; universally accepted principal that exclusions are also strictly construed in a manner which affords the broadest coverage); Prudential Prop. & Cas. Ins. Co v. Swindal, 622 So.2d 467 (Fla. 1993)(ambiguities are interpreted liberally in favor of the insured).*

Stated differently, the facts alleged in the Amended Complaint, the policy provisions from the policy attached to the Amended Complaint, and applicable legal principles, taken

together, plausibly demonstrate "coverage" for the risk alleged, as a matter of law, not a lack of coverage.   And so, when the Insurer writes that the "simple truth" [DE-13, p. 10] and the "inescapable conclusion" to be reached from the policy is that Prime Time's "alleged loss is not covered" [DE-13, p. 12], the Insurer is plainly wrong.

### Prime Time Sufficiently Alleges "Loss of" or "Damage to" Insured Property

Interchanging distinct legal concepts of cause and causation, the Insurer next contends that Prime Time has not sufficiently alleged that there was a "direct physical loss of <u>or</u> damage to property" at the insured premises. [DE-13, p. 7].   This is a shifting and false premise, again, conflating coverage with causation and shifting indiscriminately between cause of loss and the loss suffered.   In addition, it also overlooks the rules of policy construction for undefined terms in a policy of insurance.

It goes without saying that the policy requires an event to cause an actual loss or damage to the property insured.   But, is not business income covered commercial "property" under this policy?   It is.   Has business income not sustained a "loss" or "damage" which is actual, when operations were suspended and monies which otherwise would have been earned, were not earned, and monies which would have been expended from gross revenues to pay for "normal operating expenses" instead were paid for out-of-pocket?   It has.   Is not the proximate efficient cause– although this is not the causation standard applicable in this case– of the "loss of" or "damage to" business income and business operations the governmental order suspending Prime Time's operations?   The answer is: yes.   *See, State Nat. Ins. Co. v. White, 482 Fed.Appx. 434, 438 (11th Cir. 2012)(policy language requires some causal connection, but not proximate cause"); see also, Sebo v. American Home Assurance Co., Inc. 208 So.3d 694, 698 (concurrent*

*causation is applicable causation standard under all-risk policy, not proximate efficient causation).[4]*

"Direct" is undefined in the policy.  "Physical" is undefined in the policy.  "Loss" is undefined in the policy. "Damage" is undefined in the policy.   "Direct Physical Loss" is undefined in the policy.   In accordance with well-established rules of interpretation, terms utilized in an insurance policy should be given their plain and unambiguous meaning as understood by the "[wo]man-on-the-street," not a "Philadelphia lawyer."  *State Farm Fire and Cas. Co. v. Castillo, 829 So.2d 242, 244 (Fla. 2002); Hartnett v. Southern Ins. Co, 181 So.2d 524 (Fla. 1965)(so long as policies are drawn in such a manner that it requires proverbial Philadelphia lawyer to comprehend terms embodied, courts should construe them liberally in favor of the insured and strictly against insurer).*

Black's Law Dictionary defines "direct" as "immediate; by the shortest course; without circuity; operating by an immediate connection or relation." *Black's Law Dictionary, 11th Edition.*   Prime Time's loss of business income was "immediate" and therefore, "direct." According to Black's Law Dictionary, "Physical" is defined as "material, substantive; having an objective existence." *Id.*   Prime Time's loss of business income was "material," "substantive" and "objectively" real and, thus, it was "physical" and "actual."  Merriam Webster defines "Loss" as "the failure to gain, win, obtain, or utilize; decrease in amount, magnitude, or degree; the amount of an insured's financial detriment that the insurer is liable for." *www.merriam-webster.com.*   Prime Time's business income did "decrease in amount" to Prime Time's

---

[4] In Florida, the concurrent causation doctrine adopted by the Florida Supreme Court in *Sebo II* for all-risk policies provides that where a covered cause of loss acts in conjunction with an excluded cause of loss to cause a loss, there is coverage for the entire loss.  For that reason, in this case, it makes no difference as to whether the loss was caused by the governmental suspension order or the COVID-19 virus itself, assuming this policy were to contain a virus exclusion.  But, this policy covers all-risks and contains neither a virus exclusion, nor a governmental suspension order exclusion and there is a clear and "direct" causal connection (as the efficient proximate cause) for both the governmental order and COVID-19 virus pandemic, itself, to the actual "loss" suffered.

"financial detriment" and qualifies as a "loss."  Merriam-Webster defines "Damage" as "physical harm caused by something in such a way as to impair its value, usefulness, or normal function." *Id.* Prime Time's business income suffered real harm to impair its value, its building lost "usefulness," and its normal operations were "suspended," all of which equates with "loss" or "damage."   The policy specifically schedules Business Income as insured "Commercial Property." [DE-6-1. p.].   The policy specifically defines "suspension" as a "slow down or cessation" of normal business operations.  To say the least, acceptance of the idea advanced in the Insurer's motion that specifically schedule business income does not qualify as "property" insured under the policy's coverage forms appears passing strange.  That said, under this policy, reasonable minds cannot differ that to a reasonable "woman-on-the-street" a loss of or damage to business income caused by the forced suspension of business operations by governmental order qualify as a "loss of" or "damage to property" which is both "immediate" and "direct," which is "material," "substantive," and having an objectively "physical" and "actual" existence, that constitutes a sufficient "financial detriment."

Apart from this exercise in plain meaning, the words at issue in this case, in Florida, in the all-risk coverage grant, have already been construed for plain meaning.  For the all-risk coverage grant, the word "loss," in the phrase "direct physical loss," means a diminution of value of "something."  *Homeowner Choice Property & Casualty v. Miguel Maspons, 211 So.3d 1067, 1069 (Fla. 3d DCA 2017).*  "Direct" and "Physical" are held to simply modify "loss" and only impose the requirement that the damage be "actual." *Id.*  The "something" with diminished value, in this case, is Prime Time's business income and usefulness of its building and equipment for its intended purpose.

As it was in *Maspons,* so it is here.  Examining the plain language of the all-risk policy, in *Maspons* and in this case, "it is clear that the failure of [property at issue] to perform its function constituted a "direct" and "physical" loss to the property within the meaning of the policy"— even in the absence of "damage" to the property insured.  *Id.*  As it relates to the all-risk coverage grant of the Special Form and the "business income," "building," and "business operations" explicitly insured under this policy, *Maspons* forecloses the Insurer's argument that damage to the building or structure is required to trigger coverage or that damage to that insured property is "not covered."

But, the Insurer is wrong for a more fundamental reason.  The policy terms in this case that the Insurer urges limit coverage do not come from the all-risk coverage grant, at all. Rather, the Insurer pulls them from a portion of a definition, of one endorsement of a multi-part policy. In that portion of the policy, the words "direct physical loss of <u>or</u> damage to" are stated in the disjunctive, indicating that (1) "direct physical loss" is something different than "damage" and (2) the words "direct" and "physical" modify only the word "loss," not "damage."  In other words, the plain language of the policy definitions section does not require "damage" to be either "direct" or "physical," and neither does the language of the overall all-risk policy grant under *Maspons*—that loss only has to be "actual."  And, given that "direct physical loss" in the all-risk coverage grant does not mean either "direct" or "physical," but only "actual," there is no compelling policy interpretation argument advanced by the Insurer that the definition of "direct physical loss" in the policy definition imposes either a "direct" or "physical" requirement. Black's Law dictionary defines "actual" as "real; substantial; existing presently in act having a valid objective existence as opposed to that which is merely theoretical or possible."  *Black's Law Dictionary, 11th Ed.*   The COVID-19 pandemic is real.  So are Governor DeSantis' orders.

Prime Time's loss of business income, as defined is the policy, is just as real.  Accordingly, all of these things are "actual" and because they are "actual" they are both "direct" and "physical," it is "clear" that Prime has suffered "direct physical loss" as well as a "direct" "physical loss" "of" and "damage" "to" property  *See, Maspons, 211 So.3d at 1069.*

The Insurer nonetheless contends that Prime Time has not pled any form of direct "physical loss or damage to *anything*" [DE-13, p.8] and goes on to argue that, under the terms of this policy, when read as a whole, the policy requires actual "damage or destruction of *real* property," requiring a "distinct demonstrable, and physical alteration of its *structure*." [DE-13, p.8-9](Emphasis added).  If the insurer intended to limit its policy to *only* "physical" damage *only* to "real" property and "structures," or, alternatively, to exclude "business income" as covered "property" that was capable of loss or damage,, the Insurer could easily have done so simply by adding language or definitions to that effect.  *See United States Fire Ins. Co. v. J.S.U.B., 979 So.2d 871, 884 (Fla. 2007)(if the insurer intended to preclude coverage, it was incumbent on [the insurer] to include clear language to accomplish this result).*  But, in this policy, the Insurer instead chose not to define those terms and imposed no such definitional limits. Having failed to define a term in a policy, the insurer cannot take the position that there should be a narrow, restrictive interpretation of the coverage provided.  *State Farm Fire & Cas. Co. v. CTC Development Corp., 720 So.2d 1072, 1076 (Fla. 1998); State Farm Mut. Auto. Ins. Co. v. Pridgen, 498 So.2d 1245, 1247 n. 3 (Fla. 1986).*

At best, the Insurer's argument that the actual loss of business income does not constitute direct physical loss of or damage to covered property suggests an ambiguity that must be construed against the Insurer.  *See Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000)(insurance contracts are to be construed in accordance with the plain language, any*

*ambiguity interpreted liberally in favor of insured and against insurer); Travelers Indemn. Co. v.*
*PCR, Inc., 889 So.2d 779, 785 (Fla. 2004)(policy language is considered ambiguous if the*
*language is susceptible to more than one reasonable interpretation).*

Further confirming that adopting the Insurer's interpretation results in noting more than
ambiguity is the Insurer's argument that its interpretation is "buttressed" by the policy's "period
of restoration" definition.  [DE-13, p. 9].  The Insurer argues that the period of restoration ends
when the premises is "repaired, rebuilt or replaced," reasoning that it makes little sense to
construe the policy to permit direct physical damage to covered property such as "business
income" because that *type* property— even though it is specifically insured--is "utterly incapable
of being repaired." [DE-13, p. 10].

But, again, the Insurer's contention, here, is not only based on an erroneous premise
(since the policy does not require losses to be repaired, but instead indemnified), but it is also
incomplete, because it focuses only on one section of the "period of restoration" definition for its
entire coverage rationale and avoids completely the definition of "suspension"— which is defined
by the policy as a "slowdown or cessation of your business activities."  Like a loss of business
income cannot be "repaired," neither can a slow down or cessation of business activities, but a
plain reading of the policy shows that both nevertheless constitute a "loss" under the policy. In
addition, the Insurer avoids the additional Extra Expense coverage, which provides:  "We will
pay Extra Expense (other than expense to repair or replace property)."  Thus, it is not warranted
for the Insurer to conclude from a portion, of one definition, of one endorsement, of a multi-part
policy that the policy as a whole requires damage requiring repair to a building to "trigger"
coverage when other portions of the policy expressly provide for coverage "other than to repair
or replace" for what the insurer contends are incorporeal, intangible, and uncovered losses.

With this argument, the Insurer has violated another well-settled rule of policy construction, requiring that the policy must be read as a whole, and every provision must be accorded its full meaning and operative effect. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So.2d 938, 941 (Fla. 1979(noting that every provision in a contract should be given meaning and effect and apparent inconsistencies reconciled if possible); see also, U.S. Fire Ins. Co. v. J.S.U.B., Inc. 979 So.2d 871 (Fla. 2007)(noting that principles governing construction of insurance contracts dictate that when construing an insurance policy to determine coverage the pertinent provisions should be read in pari materia).*

Underscoring the entire ambiguity analysis is the Insurer's concession that if an insured structure becomes uninhabitable or unusable for its intended purposes— even if not actually damaged— "the building [covered property] may be considered to have sustained a physical loss." [DE-13, p.12]. And so, in addition, to the fact that "business income" property suffered a loss, Prime Time's building--according the Insurer's own argument--may have as well under the Building and Property Form, because it is "unusable." Overlooked, here, is that the Business Interruption Form also provides for the additional "Civil Authority" coverage, which Prime Time alleges also provides coverage for the governmental suspension. Particular words and phrases, as the Insurer urges, cannot be read in isolation from other policy provisions. For purposes of a motion to dismiss, the strong argument is that, even reading the policy as the Insurer urges, elucidates a plausible basis alleged in the Amended Complaint for coverage which, for purposes of Rule 8, the Insurer is on notice of. Put another way, the allegations of the Amended Complaint contain a short and plain statement and provide fair notice to the Insurer of the claims raised (along with demonstrating that those claims are meritorious), requiring the Insurer's motion to dismiss to be denied.

In this regard, the Insurer is unable to reconcile its urged construction with the Special Form all-risk coverage grant, which sets out "special exclusions" applicable only to the Business Income Form, excluding loss of specific "property," such as "radio antennas" and, importantly for business income, loss due to "suspension" of a "license, lease, or contract," but not loss to business income from suspension caused by a governmental order.  While the Insurer argues that such "incorporeal" losses such as "business income" are expressly not "covered," the policy appears to provide otherwise, covering all risks of loss, except specifically excluded losses to "business income" resulting from a "suspension" of a "license, lease, or contract."  Again, if the Insurer intended to exclude losses to "intangible" or "fungible" property, such as "money" or "business income," this "special exclusion" applicable strictly to the Business Income Form, demonstrates that the Insurer knew exactly how to do so, but intentionally chose not to do so. Under the plain language, then, of this policy, loss to "business income" resulting from the "suspension" due to a "license, lease, or contract" is specifically excluded, but loss to "business income" resulting from a "suspension" caused by "governmental order" is covered. *See, LeFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516 (11th Cir. 1997(noting that burden of proving an exclusion to coverage is on the insurer); see also, Auto-Owners Ins. Co, 756 So.2d at 34 (noting that exclusionary clauses, if ambiguous, are construed even more strictly against the insurer than coverage clauses).*

Simply, for purposes of dismissal, the Insurer has failed to demonstrate that the allegations of the Amended Complaint are cast solely within a clear policy exclusion and are subject to no other reasonable interpretation, such that the Insurer is entitled to either dismissal or a declaration of no coverage, as a matter of law.  If anything, the Insurer's motion demonstrates that there is no clear exclusion applicable to any allegation of the Amended Complaint and that

there are various other reasonable interpretations of the policy coverage, exclusions, and terms than the narrow, restricted interpretation urged by the insurer in its motion.  *See, Hartford Accident and Idem. Co. v. Beaver, 466 F.3d 1289, 1296 (11th Cir. 2006)*.  This confirms that a declaratory judgment is particularly appropriate under the facts alleged in, and exhibits attached to, the Amended Complaint.

### Resolution of These Issues on a Motion to Dismiss Is Inappropriate

At its core, the Insurer argues that in order to recover under the policy, damage to Prime Time's building or structures is required.  The Insurer relies on hand-picked cases which have found no coverage, at the summary judgment stage, in different factual situations arising under different insurance policies.  Yet, the Insurer's motion notes there are others where coverage has been found, rejecting the very arguments raised by the Insurer, here.  And, still others not cited by the Insurer also exist.[5]

Ultimately, the COVID-19 pandemic is without factual or legal precedent and the indispensable rule is to begin and end any analysis with the facts and policy in this case, not a different one.  Unlike Commercial General Liability policies, the commercial insurance policy at issue this case, and those in the cases cited by the parties in their respective papers, are not standard policy forms— they are all different.  Where the policies and underlying facts are different, a decision in an insurance policy interpretation case is not binding in a subsequent case.  *See, U.S. Fire Ins. Co, 979 So.2d at 884*.

The point is that in order for this Court to conclude that there is no coverage, as a matter of law, under the facts and policy in this case, the Court needs to engage in multifaceted contract

---

[5] *See, e.g., U.S. Airways v. Commonwealth Ins. Co., 64 Va. Cir. 408 (2004)(business interruption coverage 9/11 airport closure order); Oregon v. Shakespeare Festival Ass'n v. Great Am. Ins. Co., No. 1:15-cv-01932-CL (D.Or. 2016); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co., 2014 WL 6675934 (D.N.J. 2014); Murray v. State Farm Fire & Cas. Co., 509 S.E.2d 1, 17 (W.Va. 1998); Hughes v. Potomac Ins. Co, 18 Cal.Rptr. 650, 655 (Cal. App. 1962); Travco Ins. Co. v. Ward, 715 F.Supp.2d 699 (E.D.Va. 2010).*

interpretation, many aspects of which the Insurer's motion fails to even address and this response only marginally touches upon. For a declaratory action on a policy, the required adjudicative process is better suited for summary judgment, not a motion to dismiss. *Unimerica Ins. Co. v. GA Food Services, Inc., 2014 WL 6978835 (M.D.Fla. 2014)(policy interpretation better suited for summary judgment).* The procedurally correct result is to deny the Insurer's Motion to Dismiss and defer until summary judgment the presentation of more considered and concentrated arguments necessary for the coverage determination in this case. Indeed, this case, and other similar cases around the country, is presently under consideration for consolidation by the U.S. Judicial Panel on Multidistrict Litigation. [DE-14].

## CONCLUSION

For those reasons, the Insurer's Motion to Dismiss [DE-13] is due to be denied.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Florida by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/Michael V. Laurato*
MICHAEL V. LAURATO
Florida Bar No. 181447
AUSTIN & LAURATO, P.A.
1902 W. Cass Street
Tampa, Florida 33606
(813)258-0624 Tel.
(813)258-4625 Fac.
mlaurato@austinlaurato.com
TRIAL COUNSEL